# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. _____ |
| Plaintiff, | ) | |
| *ex rel.* | ) | **JURY TRIAL DEMANDED** |
| [UNDER SEAL], | ) | |
| Plaintiff- Relator, | ) | **COMPLAINT** |
| v. | ) | |
| [UNDER SEAL], | ) | |
| Defendants. | ) | |

# FILED IN CAMERA AND UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| *ex rel.* | ) | |
| | ) | |
| MATTHEW TULIN | ) | **COMPLAINT** |
| | ) | |
| Plaintiff- Relator, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TENET HEALTHCARE CORPORATION; | ) | |
| VALLEY BAPTIST HEALTH SYSTEM; | ) | **FILED IN CAMERA** |
| VANGUARD HEALTH SYSTEMS; | ) | **AND UNDER SEAL** |
| VHS VALLEY MANAGEMENT | ) | **Pursuant to 31 U.S.C. § 3730(b)(2)** |
| COMPANY, INC.; VHS BROWNSVILLE | ) | |
| HOSPITAL COMPANY, LLC; VHS | ) | |
| HARLINGEN HOSPITAL COMPANY, | ) | |
| LLC; DR. RICK BASSETT; and | ) | |
| JOHN DOES #1-100, FICTITIOUS NAMES, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. JURISDICTION AND VENUE ............................................................................ 5

III. THE PARTIES .................................................................................................... 5

    A. RELATOR ................................................................................................. 5

    B. DEFENDANTS .......................................................................................... 6

        1. Tenet Healthcare Corporation ...................................................... 6

        2. Vanguard Health Systems, Inc. .................................................... 7

        3. Valley Baptist Health System LLC ............................................. 7

        4. VHS Brownsville Hospital Company, LLC.................................. 8

        5. VHS Harlingen Hospital Company, LLC .................................... 8

        6. VHS Valley Management Company, Inc....................................... 9

        7. Dr. Rick Bassett........................................................................... 9

        8. Defendants John Does #1-100 ...................................................... 9

IV. STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS .................................... 9

    A. FEDERAL GOVERNMENT HEALTH PROGRAMS ........................................ 9

    B. THE FALSE CLAIMS ACT AND THE MEDICARE FRAUD & ABUSE/ANTI-KICKBACK STATUTE.......................................................... 11

    C. STARK LAW-THE MEDICARE/MEDICAID SELF-REFERRAL STATUTE .................... 14

    D. BILLING FOR OBSERVATION SERVICES UNDER MEDICARE..................... 15

V. SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS ............................. 18

    A. DEFENDANTS' COMPENSATE PHYSICIANS FOR REFERRING PATIENTS TO VALLEY BAPTISTS' FACILITIES IN VIOLATION OF THE STARK LAW AND THE FEDERAL ANTI-KICKBACK STATUTE........................ 18

    B. DEFENDANTS ENTERED INTO MEDICAL DIRECTORSHIPS WITH PHYSICIANS TO COMPENSATE THEM FOR REFERRING PATIENTS TO VALLEY BAPTISTS' FACILITIES ........................ 19

    C. DEFENDANTS OVERPAID PHYSICIANS TO COMPENSATE THEM FOR REFERRING PATIENTS TO VALLEY BAPTISTS' FACILITIES ........................ 23

    D. DEFENDANTS' OVERBILLED THE GOVERNMENT FOR OBSERVATION STAYS........... 24

VI. COUNTS .......................................................................................................... 28

    COUNT ONE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A) (AGAINST ALL DEFENDANTS).......................................... 28

i

COUNT TWO Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (Against All Defendants) ........................................................................ 29

COUNT THREE Federal False Claims Act, 31 U.S.C. § 3729 (a)(1)(G) (Against All Defendants) ............................................................... 30

COUNT FOUR Federal False Claims Act, 31 U.S.C. § 3729 (a)(1)(C) (Against All Defendants) ............................................................... 30

COUNT FIVE Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.* (Against All Defendants) ............................................. 31

VII.    PRAYER ........................................................................................ 32

# I. INTRODUCTION

1. Federal and state government healthcare programs, including Medicare and Medicaid, pay for most treatments on a piecemeal basis. As a result, in effort to boost their revenue hospitals and other medical providers, including those involved in this action, engage in a variety of conduct designed to increase the number of patients they treat and to increase the reimbursement they receive for each patient. Defendants VHS Brownsville Hospital Company, LLC ("Brownsville"), VHS Harlingen Hospital Company, LLC ("Harlingen"), and their owners operated two hospitals that illegally boosted their patient counts and revenue by both paying kickbacks to doctors for referring patients and by overbilling for "observation" stays.

2. Brownsville and Harlingen are owned Valley Baptist Health System ("Valley Baptist") which is owned by Vanguard Health Systems, Inc. ("Vanguard") which in turn is now owned by Tenet Healthcare Corporation ("Tenet"). In his role as Defendant Valley Baptist's Senior Vice President and Chief Financial Officer, Relator Matthew Tulin was tasked with reviewing the business relationships and transactions that could affect Valley Baptist's financial wellbeing. Through the discharge of this duty, Relator Tulin became aware that Defendants' engaged in conduct that violated the Anti-Kickback Statute, the Stark Act, and the False Claims Act ("FCA"). Specifically, Relator Tulin uncovered that Defendants (1) paid illegal kickbacks, under the guise of medical directorship agreements, to physicians in order to encourage patient referrals and (2) overbilled the Government for observation stays.

3. The Federal Anti-Kickback Statute and the Stark law prohibit health care providers from paying kickbacks to induce the referral of patients to their facilities. Health care providers that seek reimbursement from government payors are required by the Center for Medicare & Medicaid Services ("CMS") to certify that in providing the services for which reimbursement is sought, they did not violate either of the aforementioned statutes. This

requirement creates an obstacle for hospitals, such as Defendant Valley Baptist, seeking to use kickbacks to attract well-credentialed and skilled physicians to their facilities.

4.      In order to get local doctors to refer patients to their hospitals, Defendant Valley Baptist hired doctors as "medical directors." A medical director is generally responsible for directing the operations of the hospital's medicine practice for his/her area, for overseeing the clinical quality of care provided by the hospital, and for serving as the primary representative of the practice in interactions with hospital administration and the medical staff. Although the contracts between Valley Baptist and its Medical Directors set forth such responsibilities, the Medical Directors did not provide such services. Instead, the Medical Directors recorded the time they spent treating patients at the hospital – patients they referred – as administrative Medical Director time. Defendants' payments and receipt of Medical Director payments are illegal kickbacks made for the purpose of increasing referrals.

5.      Consequently, the medical directorship contracts served as nothing more than an excuse to exchange remuneration for patient referrals – conduct that violates both the Federal Anti-Kickback Statute and the Stark law.

6.      The Stark law also requires hospitals to pay their employees wages that are commensurate with the market rate and that are commercially reasonable. The rationale is that exorbitant salaries suggest that the employee is being compensated for patient referrals. Relator Tulin observed that, during the relevant time period, Defendant Valley Baptist paid physicians outrageous salaries, which bore no relation to the market price for, or the commercial reasonableness of, the services rendered. These bloated wages were paid in order to generate referrals to Defendant Valley Baptist's facilities.

7.     Defendant Valley Baptist also violated the FCA by refusing to refund money obtained as a result of the submission of improperly billed services. This failure to refund, after having knowledge of the overpayments, constitutes a "reverse" false claim.

8.     In November 2011, Defendant Valley Baptist began an internal compliance audit, covering a time period from September 1, 2011 to April 2012 (the "Observation Stay Audit"). The Observation Stay Audit revealed that due to inappropriate documentation and admission practices, Defendant Valley Baptist overbilled Medicare and Medicaid for observation stays because it, in violation of Medicare and Medicaid regulations, credited and billed as observation stay time in which the patient was not being observed.

9.     Defendant Valley Baptist "remedied" its overbilling by refunding to Medicare and Medicaid the excess amount billed for the observation stay claims submitted during the time period covered by the Observation Stay Audit. Rather than issue a traditional refund by notifying the Medicare Administrative Contractors (MACs) or CMS and issuing a payment, Defendant Valley Baptist orchestrated an "invisible" re-bill in order to avoid further scrutiny. Essentially, Defendant Valley Baptist discounted its post-Observation Stay Audit reimbursement claims to CMS until the total amount of the discounts equaled the amount by which Defendants overbilled.

10.     Defendants knew, however, that the "refund" to the Government was an insufficient remedy because the wrongful conduct that caused the overbilling started years before the Observation Stay Audit period. As a result, prior to September 1, 2011 – which is as far back as the Observation Stay Audit went back - Defendant Valley Baptist overbilled Medicare and Medicaid for observation stays in exactly the same manner as after September 1, 2011.

Defendants' failure to return the funds received from the pre-September 1, 2011 wrongfully billed services resulted in a reverse false claim which is a violation of the False Claims Act.

11.     Defendants' wrongdoing was carried out with the help of individuals working for Defendants Valley Baptist and Vanguard, including Defendant Dr. Rick Bassett, a medical director at VHS Harlingen and John Does #1-100.

12.     Relator Matthew Tulin brings this action to recover damages and civil penalties on behalf of the United States of America and the State of Texas, arising from false claims presented, or caused to be presented, for payment or approval by Tenet Healthcare Corporation ("Tenet"), Valley Baptist Health System ("Valley Baptist"), Vanguard Health Systems, Inc. ("Vanguard"), VHS Valley Management Company, Inc. ("VMC"), VHS Brownsville Hospital Company, LLC ("Brownsville"), VHS Harlingen Hospital Company, LLC ("Harlingen"), Dr. Rick Bassett, and John Does #1-100, Fictitious Names (collectively, "Defendants") in violation of the False Claims Act (31 U.S.C. §§ 3729 et seq.), the Stark law (42 U.S.C § 1395nn), and the Federal Anti-Kickback law (42 U.S.C. §§ 1320a-7(b)).

13.     Accordingly, on behalf of the United States of America and the State of Texas, pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and similar Texas state law provisions, Plaintiff and "Relator" Matthew Tulin files this *qui tam* Complaint against Defendants.

14.     Defendant Valley Baptist knowingly presented or caused to be presented false or fraudulent claims, submitted for payment or approval by federal and state agencies and/or programs, in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and similar Texas state law provisions by:

      (i)     providing excessive wages to physicians through medical directorship agreements in order to induce them to refer patients to Defendant Valley

Baptist's hospitals in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) and the Stark Law, 42 U.S.C. § 1395nn and 42 C.F.R. § 411.350 *et seq.*;

(ii)    paying physicians salaries that are substantially over the market rate and entirely unrelated to the services provided in order to establish loyalty and guarantee a steady stream of patient referrals, in violation of the Stark Law, 42 U.S.C. § 1395nn and 42 C.F.R. § 411.350 *et seq.*; and

(iii)   failing to reimburse Medicare and Medicaid for funds that were obtained as a result of companywide wrongful billing and overbilling for observational stays after having actual knowledge of the overpayments, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(G), and its predecessor section 3729(a)(7).

15.    Relator Matthew Tulin has direct knowledge of Defendants' wrongdoing.

## II.    JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

17.    Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because at least one Defendant can be found, resides, and/or transacts business in this district.

18.    Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

19.    To the extent that there has been a public disclosure unknown to the Relator, Relator is an "original source[s]" and meets the requirements under 31 U.S.C. § 3730(e)(4)(B).

## III.    THE PARTIES

### A.    RELATOR

20.    Matthew Tulin was Senior Vice President and Chief Financial Officer ("CFO") of VHS Valley Management Company d/b/a Valley Baptist Health System from April 2012 until

September 30, 2012. In this capacity, Relator Tulin was primarily responsible for overseeing Valley Baptist's financial functions, including supervising the accounting department. Tulin also created budgets, assisted operationally with mergers and acquisitions, assessed the profitability of service lines, streamlined and facilitated patient billing, and organized financial data for SEC filings.

21.     In addition to these functions, Matthew Tulin was responsible for managing the finances of Valley Baptist's health insurance plan, employee physician group, and Valley Baptist's joint ventures or agreements with physicians. He reported to Manuel M. Vela, Valley Baptist's President and Chief Executive Officer ("CEO") and David Williamson, the CFO of the Vanguard-owned Baptist Health System in San Antonio, Texas.

22.     Matthew Tulin received his business degree from the University of Alaska-Anchorage. He is a Certified Public Accountant ("CPA") and has been working in healthcare finance for over 20 years.

**B.    DEFENDANTS**

**1.    Tenet Healthcare Corporation**

23.     Defendant Tenet Healthcare Corporation is an investor-owned health care services provider headquartered at 1445 Ross Avenue, Dallas, TX 75202. Defendant Tenet owns and operates fifty-one (51) hospitals in fourteen (14) states, including Alabama, Arizona, California, Florida, Georgia, Illinois, Massachusetts, Michigan, Missouri, North Carolina, Pennsylvania, South Carolina, Tennessee, and Texas. On June 24, 2013, Defendant Tenet announced that it was purchasing Defendant Vanguard for $1.73 billion. During the pendency of this matter, Tenet Healthcare will become the successor-in-interest to Vanguard Health Systems.

### 2. Vanguard Health Systems, Inc.

24.     Defendant Vanguard Health Systems is an operator of hospitals and other medical facilities with its principal place of business at 20 Burton Hill Blvd. Suite 100, Nashville Tennessee 37215.  It owns twenty-eight (28) hospital facilities in Arizona, California, Illinois, Massachusetts, Michigan, and Texas, and controls an additional three hospitals through joint ventures.  Vanguard facilities offer medical and surgical services in a broad array of specialties including emergency services, general surgery, internal medicine, cardiology, obstetrics, orthopedics, and neurology.

### 3. Valley Baptist Health System LLC

25.     Defendant Valley Baptist Health System, founded in 1925, is a Delaware not-for-profit health system that is headquartered at 20 Burton Hills Blvd., Suite 100, Nashville, TN 37215.  Defendant Valley Baptist is a two campus system with over 850 beds that provides medical, educational, and charitable services.  Its campuses are located in Brownsville, TX and Harlingen, TX, and are both Level III Trauma Centers.

26.     On September 1, 2011, Defendant Vanguard entered into a joint venture with Defendant Valley Baptist to create what is now Defendant Valley Baptist in its new LLC form, with a majority participation by Defendant Vanguard.  Defendant Valley Baptist was funded through a combination of loans and equity capital.

27.     Defendant Vanguard invested $210 million in the joint venture and assumed $15 million in debt and other liabilities in exchange for a 51% equity interest in the "new" Valley Baptist; the "new" (i.e. Vanguard – controlled) Valley Baptist LLC then used the cash to

purchase the old not-for profit Valley Baptist's assets, and issued the "old" Valley Baptist a 49% interest in the joint venture. [1]

### 4. VHS Brownsville Hospital Company, LLC

28. Defendant VHS Brownsville Hospital Company, LLC is the wholly owned subsidiary of Defendant Valley Baptist Health System that owns the company's Brownsville, Texas campus.

29. Defendant VHS Brownsville Hospital Company, LLC is a Delaware limited liability company with a principal place of business at 1040 West Jefferson Street, Brownsville, TX 78520. Following Defendant Valley Baptist's joint venture with Defendant Vanguard, Defendant Brownsville now has a registered home office and address at 20 Burton Hills Blvd., Suite 100, Nashville, TN 37215. Defendant Brownsville provides general medical and surgical hospital services, and other healthcare services.

### 5. VHS Harlingen Hospital Company, LLC

30. Defendant VHS Harlingen Hospital Company, LLC is the wholly owned subsidiary of Defendant Valley Baptist Health System that owns the company's Harlingen, Texas campus.

31. Defendant VHS Harlingen Hospital Company, LLC is a Delaware limited liability company with a principal place of business at 2101 Pease Street, Harlingen, TX 78550. Following Defendant Valley Baptist's joint venture with Defendant Vanguard, Defendant Harlingen now has a registered home office and address at 20 Burton Hills Blvd., Suite 100,

---

[1] It is recognized that some name confusion is inevitable, since the "new" entity, 51% owned by Vanguard, uses the same name as the "old" Valley Baptist health system, a not-for-profit entity operating for many years in the Harlingen-Brownsville market. There was never a break in service with this new "joint venture, the entire transaction was held out to the public as a "joint venture", and the "new" entities still utilize the same Medicare billing numbers as the "old" entities.

Nashville, TN 37215. Defendant Harlingen provides general medical and surgical hospital services, and other healthcare services.

### 6. VHS Valley Management Company, Inc.

32. Defendant VHS Valley Management Company, Inc. is a Delaware limited liability company and is the Managing Member of Defendant VHS Valley Health System LLC. Its principal place of business is at 20 Burton Hills Blvd., Suite 100, Nashville, Tennessee 37215. Defendant VMC is a subsidiary of Defendant Vanguard Health Systems, Inc.

### 7. Dr. Rick Bassett

33. Defendant Dr. Rick Bassett is an orthopedic surgeon and a citizen of the State of Texas. Defendant Bassett served as medical director for the orthopedic surgery department at Defendant Harlingen.

### 8. Defendants John Does #1-100

34. John Does #1-100, fictitious names, are unknown co-conspirators who together with Defendants Valley Baptist, Vanguard, Brownsville, Harlingen, VMC, and Bassett conspired to perpetuate the scheme described herein. To the extent that any of the conduct or activities described in this Complaint were not performed by Defendants, but by the individuals described herein as John Does #1-100, fictitious names, the term "Defendants" shall also refer to John Does #1-100.

## IV. STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A. FEDERAL GOVERNMENT HEALTH PROGRAMS

35. The federal, state, and local governments, through their Medicaid, Medicare, Tricare, Veteran's Administration and other Government health care payors, are among the

principal payors for healthcare services, and their beneficiaries/insured are among the principal consumers of healthcare services.

36.     Medicare is a federal government health program primarily benefiting the elderly that Congress created in 1965, when it adopted Title XVIII of the Social Security Act. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

37.     Congress created Medicaid in 1965, at the same time it created Medicare. Medicaid is a public assistance program providing payment of medical expenses to low-income patients. Funding for Medicaid is shared between the federal government and state governments. The federal government also separately matches certain state expenses incurred in administering the Medicaid program. While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage, except that Medicaid usually provides more expansive coverage than does Medicare.

38.     Approximately 60% to 70% of Defendant Valley Baptist's patients utilized Medicare and/or Medicaid.

39.     Tricare, a component of the health care system of the United States military, is designed to maintain the health of active duty service personnel and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and career military retirees and their dependents. The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. Tricare is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits. Five managed care support contractors create networks of civilian health care providers. While

Tricare has certain deductibles and co-payments like other insurers, the vast majority of Tricare funds are provided by the Federal Government.

40. Whereas Tricare treats active duty military and their dependents, the Veterans Administration ("VA") provides health care and other benefits to veterans of the military through its worldwide network of hospitals and clinics. It is supplemented through contracts with non-government health care providers.

41. The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management.

### B. THE FALSE CLAIMS ACT AND THE MEDICARE FRAUD & ABUSE/ANTI-KICKBACK STATUTE

42. The Federal False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government. 31 U.S.C. § 3729(a)(1)(A)&(B). Twenty-nine states, including the state of Texas, have enacted False Claims Act statutes that apply to Medicaid fraud and/or fraudulent health care claims submitted for payment by municipal funds.

43. The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which also applies to the state Medicaid programs, provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program. In other words, the Anti-Kickback Statute prohibits recipients of government healthcare money from providing cash,

gifts, or other remuneration to induce the referral of patients to their respective businesses. The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

44. The Balanced Budget Act of 1997 amended the Medicare Anti-Kickback Statute to include administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a).

45. In accordance with the Anti-Kickback Statute, Medicare regulations directly prohibit physicians from receiving remuneration paid with the intent to induce referrals or business orders.

46. Such remunerations are kickbacks when paid to induce or reward physicians' prescriptions or to entice a physician to treat his patient in a particular hospital. Kickbacks increase government-funded health benefit program expenses by inducing physicians to bring their patients to hospitals where they are likely to receive medically unnecessary treatment, causing excessive reimbursements. Kickbacks also reduce a patient's healthcare choices, as physicians may recommend a course of treatment or facility based on the physician's own financial interests rather than the patient' s medical needs.

47. The Medicare Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3). None of the statutory exceptions or regulatory safe harbors apply to Defendants' conduct in this case.

48. The Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Medicare Anti-Kickback Statute or "Social Security Act,"

42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the False Claims Act. The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of the Social Security Act's anti-kickback provisions, like violations of the False Claims Act, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148, at Sec. 6402(h).

49. In order to participate in Medicare, providers such as hospitals and doctors, including the defendants in this matter, enter into Provider Agreements with CMS. As part of the Provider Agreement between each Defendants and CMS, the provider signs the following certification "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare."

50. After the end of its fiscal year, all hospitals, including Defendants, submit an annual Cost Report to Medicare. The Cost Reports submitted by Defendants including the certification that it is "familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." *See* 42 C.F.R. § 413.24(f)(4)(iv).

51. As detailed below, Defendants repeatedly violated provisions of the Anti-Kickback Statute, which in turn resulted in violations of the False Claims Act, because Defendant Valley Baptist utilized medical directorship positions as a means of compensating physicians, such as Defendant Bassett, for referring new patients to their facilities.

## C.    STARK LAW-THE MEDICARE/MEDICAID SELF-REFERRAL STATUTE

52.    The Medicare/Medicaid Self-Referral Statute, 42 U.S.C. § 1395nn, *et seq.,* known as the "Stark" law, prohibits a physician who has a nonexempt "financial relationship" with a provider of "designated health services," from referring patients to that health services provider. 42 U.S.C. §§ 1395nn(a)(1), (h)(6).   Examples of financial relationships include ownership, investment interests, and compensation arrangements.   42 U.S.C. § 1395nn(a)(2).   The Stark law also prohibits health services providers that have a financial relationship with a physician from presenting to Medicare or Medicaid claims for payment or reimbursement based on treatment administered to patients who were referred that physician.   42 U.S.C. §§ 1395nn(a)(1), (g)(1).

53.    The Stark Law is a strict liability statute, which confers liability without the need to establish intent if (1) there is a financial relationship between a physician and another entity (such as a hospital); (2) there is a referral for services (as defined in the statute and accompanying regulations); and (3) the transaction or relationship does not fit precisely within a statutory or regulatory "exception" (sometimes called a "safe harbor").

54.    The term "referral" is broadly defined.   It includes the request by a physician for the provision of any designated health service for which payment may be made under Medicare. A referral can be direct or indirect, meaning that physicians would be considered to have made referrals if they caused, directed, or controlled referrals made by others.   A referral can be in any form, including—but not limited to—any written, oral, or electronic means of communication. 42 C.F.R. § 411.351.   There is no exception to this definition for a "referral" made to a physician's employing hospital.

55.    Knowingly paying physicians to induce them to refer patients to your hospital and seeking reimbursement from a federal government health program or causing others to do so,

while certifying compliance with the Stark law (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates state and federal False Claims Acts.

56. Defendants repeatedly violated the Stark law, which in turn violated the False Claims Act, because Defendant Valley Baptist utilized bogus medical directorship contracts to induce physicians, and excessively compensated physicians, to refer patients to its hospitals when they otherwise would not have done so and then submitted claims relating to these patients to Medicare, Medicaid and other government payors.

**D. BILLING FOR OBSERVATION SERVICES UNDER MEDICARE**

57. Observation care is a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment *before a decision can be made* regarding whether the patient will require further treatment or if the hospital can discharge the patient. Patients who are assigned observation status are typically treated by a hospital's emergency department and require a period of treatment or monitoring before a decision regarding their admission or discharge can be made.

58. Patients may also be assigned to observation through "direct admission." A direct admission occurs when a physician in the community refers a patient to the hospital for outpatient observation, bypassing the hospital clinic or emergency department visit.

59. Medicare prohibits payment for services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y (a)(1)(A). A physician or hospital may only submit a bill for reimbursement to Medicare if it has "such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." 42 U.S.C. § 1395l(e); 42 U.S.C. § 1320a-7(b)(11); 42 C.F.R. § 405.371(d). As part of this statutory requirement, CMS requires

that health care providers retain the documentation necessary to evaluate each claim for payment. *See* 42 C.F.R. § 431.107(b).

60.     The documentation requirements for observation care are well-defined, and are set forth in both the Medicare Benefit Policy Manual (CMS Manual System Pub 100-02) and the Medicare Claims Processing Manual (CMS Manual System Pub 100-04 chapter 4, section 290). The same strict documentation requirements are applicable to claims submitted to Texas Medicaid. *See* Texas Medicaid Provider Manual Section 4.2.4.5. Observation services are coded and paid on the basis of time spent in medically necessary observation by clinical personnel. Since providers are only allowed to receive reimbursement for the amount of actual, recorded time that a patient received medically necessary observation care, the medical necessity of the observation administered as well as the duration of the care must be properly documented.

61.     Reimbursement payments must represent medically necessary services meeting the following criteria, among others:

     a.     There must be a medical observation record for the patient which contains dated and timed physician's orders regarding the observation services the patient is to receive. Medicare Claims Processing Manual, CMS Pub. 100-04, Chapter 12, 30.6.8.A.

     b.     Progress notes must be prepared by the physician while the patient received observation services. This must include, among other requirements, documentation of the clock time that shows the time that observation care is initiated in accordance with a physician's order. General standing orders for observation services following all outpatient surgery are not recognized. Medicare Claims Processing Manual, CMS Pub. 100-04, Chapter 4, 290.2.2.

c.      Documentation stating the stay for observation care or inpatient hospital care involves 8 hours, but less than 24 hours.  For payment to a hospital under Medicare, a stay of less than 8 hours is not separately compensated; payment is considered "bundled" with the underlying outpatient visit.  Medicare Claims Processing Manual, CMS Pub. 100-04, Chapter 12, 30.6.8.C.

62.      Documentation must also reflect the clock time for the end of observation ("stop time").  This is the time when all medically necessary services related to observation care are completed.  The stop time occurs before discharge, at the point when the need for observation has ended.  Other services (such as a final lab test or completing discharge paperwork) *not* meeting the definition of observation care may still be provided after the stop time and before formal "discharge" from the hospital.

63.      Observation services must not be billed concurrently with diagnostic or therapeutic services for which active monitoring is a part of the procedure (such as a colonoscopy or chemotherapy).  In situations where such a procedure interrupts observation services, the time for the procedure as well as the normal post-procedure 'observation' of the patient as a part of that procedure must be deducted from the 'observation time' being billed in order to avoid double-billing for the observation associated with the procedure or test itself.

64.      In addition, hospitals must not report as observation care those services that are part of another service, such as postoperative monitoring during a standard recovery period from a surgery. (*e.g.*, 4-6 hours).  This is the usual "recovery room service" which is bundled for payment with the surgery itself.

## V.    SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS

### A.    DEFENDANTS' COMPENSATE PHYSICIANS FOR REFERRING PATIENTS TO VALLEY BAPTISTS' FACILITIES IN VIOLATION OF THE STARK LAW AND THE FEDERAL ANTI-KICKBACK STATUTE

65.    During the relevant time period, Defendants orchestrated and carried out schemes to compensate physicians for patient referrals. Relator Tulin became aware of Defendants' wrongful conduct in his capacity as Defendant Valley Baptist's CFO.

66.    As CFO of Defendant Valley Baptist, Relator Tulin was required to review all contracts with vendors, physicians, and other parties that obligated Defendant Valley Baptist to pay at least $10,000, and determine whether (1) they appeared appropriate based on Defendant Valley Baptist's policies and Relator Tulin's training and experience and (2) there was appropriate documentation.

67.    On a few occasions, Manny Vela, CEO of VHS Valley Health Systems, asked Relator Tulin to give special attention to contracts that he viewed as especially questionable. For example, Vela was suspicious of Defendant Valley Baptist's agreements with a vendor called Accretive Health and asked Tulin to review those contracts.

68.    Whenever Relator Tulin encountered a contract that he believed to be inappropriate, he would either contact the relevant vendor or department to challenge the payments due or make the payment and dispute the suspect payment later. Relator Tulin would then return the contract to the manager of the relevant employee group to track down any necessary documentation or to reconcile provisions of the contract that rendered it invalid. After reviewing Defendant Valley Baptist's contracts, Relator Tulin reported the results to Manny Vela, CEO of VHS Valley Health Systems.

69.    While reviewing Valley Baptist's medical directorship and other physician contracts, Relator Tulin discovered that certain of Defendants' actions were geared towards

18

inducing physician referrals. First, Defendant Valley Baptist offered select physicians medical directorship positions and substantial salaries in exchange for bringing patients to Defendants' hospitals. Second, Defendant Valley Baptist compensated in-house physicians far in excess of the fair market value and in a manner that was not commercially reasonable in the absence of any referrals for other services within Defendant Valley Baptist. This overpayment encouraged the in-house physician to increase his/her internal 'referrals' for services, thereby increasing Defendants' revenue.

**B. DEFENDANTS ENTERED INTO MEDICAL DIRECTORSHIPS WITH PHYSICIANS TO COMPENSATE THEM FOR REFERRING PATIENTS TO VALLEY BAPTISTS' FACILITIES**

70. The first scheme that Relator Tulin uncovered was Defendants' payment of kickbacks in the form of compensation for bogus medical directorships.

71. During the relevant time period, Defendant Valley Baptist entered into medical directorship agreements, which purported to compensate the medical directors for dedicating a minimum number of hours to completing the administrative tasks outlined in their contracts. In reality, the payments received by the bogus medical directors were not dependent upon the performance of contractual duties. Defendant Valley Baptist consistently ignored the bogus medical directors' failure to fulfill their administrative responsibilities, as long as the stream of patients referred to Valley Baptist's facilities remained steady.

72. The agreements for the bogus medical directorship positions required that the medical directors spend a minimum number of hours at their respective Valley Baptist facilities and record their administrative activities on timecards. This 'requirement,' however, was nothing more than a thinly-veiled attempt to cloak the illegal nature of Defendant Valley Baptist's relationship with the bogus medical directors, and was not enforced. In fact, Defendant

Valley Baptist encouraged the bogus medical directors to misrepresent their surgical time (or time spent treating patients) as time spent performing administrative tasks.

73. Despite knowledge of the medical directors' blatant breaches of contract, Defendant Valley Baptist reprimanded them only when they decreased the number of patients referred to Valley Baptist facilities. In those instances, Defendant Valley Baptist responded by reducing the offending medical director's pay by an amount equal to their decline in patient referrals.

74. One physician who benefited from Defendants' bogus medical directorship, kickback scheme was Defendant Rick Bassett.

75. In 2010, Defendant Valley Baptist hired Defendant Bassett, an orthopedic surgeon, to be the medical director of Defendant Harlingen's orthopedic department. Defendant Valley Baptist agreed to pay Defendant Bassett $180,000 per year in exchange for ninety (90) work hours per month as the medical director.

76. The Bassett medical directorship contract required Defendant Bassett to develop and implement policies, procedures, and best practices, make equipment recommendations and recommendations for service changes to administration, and oversee all training and continuing education for the hospital's orthopedics staff. The contract also required him to ensure that the facility's orthopedics practice was in compliance with all federal, state, and local laws.

77. While serving as the medical director for Defendant Harlingen's orthopedic department, Defendant Bassett ran his own successful orthopedic practice, which included an independent outpatient clinic. Defendant Bassett dedicated a large portion of his time to his practice, performing approximately twenty-four (24) surgeries per week.

78.     Defendant Basset performed surgery only on Mondays, Wednesdays, and Fridays, and during those days he spent between eight to twelve hours a day in the operating room.   Once he entered into the medical directorship contract with Defendant Valley Baptist, Defendant Bassett began referring his surgeries to Defendant Harlingen, allowing Defendants to profit from the substantial costs associated with surgery and any ancillary treatment that a surgery patient may receive.

79.     In addition to performing surgeries, Defendant Bassett's medical directorship agreement required him to spend ninety hours per month at Defendant Harlingen performing his administrative duties.   At the end of every month, Defendant Bassett was obligated to, and did, submit a timecard to Defendant Valley Baptist representing that he had satisfied this requirement.  Defendant Bassett's usual practice was to submit timesheets representing that he spent approximately eight hours each Monday, Wednesday, and Friday at Defendant Valley Baptist's Harlingen campus, serving as a medical director and performing "educational activities."

80.     In most cases, the same days and times that Defendant Bassett claimed to be serving as a medical director he was actually performing between eight and twelve hours of surgery.  Defendant Valley Baptist's billing records and operating room schedules show that Defendant Bassett's timesheets were completely fictitious, designed merely to create a paper trail to justify Defendant Valley Baptist's medical directorship payments to Defendant Bassett.

81.     Defendant Basset's salary and hour requirements also demonstrate the illegitimacy of his medical directorship contract.   According to the 2012 Medical Group

Management Association (MGMA)[2] Medical Directorship and On-Call Compensation Survey, Defendant Bassett's medical director salary was approximately five-times the mean salary for orthopedic department medical directors and in the 99th percentile of orthopedic department medical director salaries.

82.    The MGMA Survey also reveals that the monthly hour requirement (90 per month) in Defendant Bassett's medical directorship contract is far beyond the norm. On average, orthopedic department medical director contracts provide for approximately six hours a week, or 25 hours per month, performing medical director duties. Defendant Bassett's ninety (90) hour per month requirement places him above the 99th percentile for hours spent on directorship duties and is nearly four times the average. Because Bassett did not actually perform 90 hours per month of medical directorship activities, and there was never any intent for him to do so, this inflated number of hours served only as a pretext for Defendant Bassett's abnormal salary.

83.    In early summer 2012 Defendant Bassett asked Defendant Valley Baptist to increase his medical directorship compensation. Defendant Valley Baptist denied this request, and in response, Defendant Bassett began referring two-thirds of his surgeries to a competing hospital. As a result of Defendant Bassett's actions, Defendant Valley Baptist reduced his medical directorship wages by two-thirds – an amount equal to his reduction in patient referrals. Defendant Valley Baptist's reaction reveals that Defendant Bassett's medical directorship salary was nothing more than a payment to induce him to refer patients to, and perform surgeries, at Defendant Valley Baptist's facilities.

---

[2] The Medical Group Management Association (MGMA) Annual Surveys are the most widely used sources of compensation, workload, hours, and other compensation or management data for physicians in the U.S. The surveys are very broad and considered the 'gold standard' for fair value assessments in the healthcare industry.

84.     During his employment with Defendant Valley Baptist, Relator Tulin observed a large number of medical directorship contracts between Defendant Valley Baptist and referring doctors, more than he had seen at any other hospital during his 20 year career at similar-sized facilities.   In some cases, Defendant Valley Baptist compensated "medical directors" without written agreements. The entire practice of sham medical directorship contracts at Defendant Valley Baptist facilities constitutes a scheme to compensate physicians for referring patients to Defendant Valley Baptist's hospitals.   This conduct violates both the Anti-Kickback Statute and the Stark law and, as a result, the False Claims Act as well.

### C.     DEFENDANTS OVERPAID PHYSICIANS TO COMPENSATE THEM FOR REFERRING PATIENTS TO VALLEY BAPTISTS' FACILITIES

85.     In addition to the bogus medical directorship agreements, Relator Tulin witnessed Defendant Valley Baptist improperly paying exorbitant salaries to some of its physicians in order to compensate them for generating additional in-house referrals such as repeated tests.

86.     For example, Defendant Valley Baptist paid Dr. Fadi Alfayoumi, a cardiologist-interventionist, approximately $1.8 million per year as an employed physician working at Valley Baptist's Brownsville hospital.

87.     According to the MGMA Annual Compensation and Productivity Survey for 2012, Dr. Fadi Alfayoumi's compensation is far outside industry norm.   The Survey states that in the southern region, which includes the state of Texas, the mean and median yearly salaries for cardiologist-interventionists were $620,463 and $627,332, respectively.   Cardiologist-interventionists in the 90th percentile made $827,326 per year.   Dr. Fadi Alfayoumi's compensation places him in the 99.99th percentile for cardiologist-interventionists.

88.    Dr. Alfayoumi's position among the highest paid cardiologist-interventionists is particularly outside the norm because Defendant Valley Baptist relies heavily upon patients insured by Medicare, Medicaid and other government payors.

89.    The Stark law makes clear that the financial relationship between a physician and his employer is prohibited if the amount of the remuneration "is [in]consistent with the fair market value of the services."    42 U.S.C. § 1395nn(e)(2)(B)(i).    Further, the financial relationship between a physician and his employer constitutes a "bona fide employment relationship" as long as the remuneration provided is commercially reasonable even without referrals being made to the employer.  42 U.S.C. § 1395nn(e)(2)(C).  Dr. Alfayoumi's salary is both inconsistent with the fair market value for his services and commercially unreasonable.

90.    Given that Dr. Alfayoumi makes three times more than the average cardiologist-interventionist and one million dollars more than the top tenth, his wages are not commercially reasonable and suggest that he is being compensated for the referrals he made and the additional and potentially unnecessary treatments he performed at Defendant Valley Baptist's facilities.

**D.    DEFENDANTS' OVERBILLED THE GOVERNMENT FOR OBSERVATION STAYS**

91.    As CFO of Defendant Valley Baptist, Relator Tulin reviewed all contracts, business relationships, procedures, and audits that could financially impact the joint venture.  In this capacity, Tulin participated directly in the task forces, meetings, and work groups concerning the Observation Stay Audit, which was commissioned to determine whether Defendant Valley Baptist was improperly billing Medicare and Medicaid for outpatient observation stays from September 1, 2011 through April 2012.

92.    The Observation Stay Audit took several months to complete and was largely conducted by an outside consulting company hired by Defendant Valley Baptist.  The outside

consultants concluded that Defendant Valley Baptist improperly billed observation stays, resulting in the significant overcharging of Medicare and Medicaid. Defendant Valley Baptist improperly billed observation stays in three different ways.

93.     The first way in which Defendants overbilled Medicare and Medicaid for observation stays was to code post-surgery recovery and discharge times as part of an observation stay. After a patient has gone through an outpatient surgical procedure, the patient may experience complications that require observation care. When this occurs, only the time spent in observation addressing the post-surgery complication can be billed as an observation stay. Hospitals are not allowed to bill, as part of the observation care services, the period of time that the patient spent in recovery or any other time after all medically necessary services requiring clinical observation are complete. Medicare Claims Processing Manual, CMS Pub. 100-04, Chapter 4, 290.2.2. Defendant Valley Baptist, however, improperly billed recovery and discharge times as part of an observation stay.

94.     The second way in which Defendants overbilled Medicare and Medicaid for observation stays was to routinely conduct post-surgery recovery for outpatient procedures in a hospital bed in order to bill for an observation stay. As described above, a same-day surgery patient cannot be admitted to observation unless he experiences an unusual and unexpected event, deviating from normal recovery. Medicare Claims Processing Manual, CMS Pub. 100-04, Chapter 4, 290.2.2. In other words, an observation stay cannot be used as a substitute for recovery room services. Accordingly, Defendants were wrong to bill post-outpatient surgery recovery time as an observation stay simply because it took place in a hospital bed.

95.     The third way in which Defendants overbilled Medicare and Medicaid for observation stays was to falsely record stop times. Because the clinical notes routinely and

consistently failed to record the "stop time" for observation services, Defendant Valley Baptist developed a practice, used by coders and billers, to use the "discharge from hospital" time in the admission/discharge system as a "proxy" for the actual regulatory-defined "stop time." This overstated, in every case, the length of medically necessary clinical observation because the actual stop time will always be earlier than the time the patient is discharged from the hospital.

96. CMS has very specific policies concerning billing for observation stays in connection with outpatient services. Medicare compensates hospitals for outpatient hospital services, including observation treatment, under the Outpatient Prospective Payment System ("OPPS"). Under OPPS, CMS classifies services into Ambulatory Payment Classifications ("APC") on the basis of clinical characteristics and similar costs. All services within each APC have the same payment rate.[3]

97. If an individual in outpatient care receives observation services for eight or more hours, CMS will classify the services under either APC 8002 or APC 8003. *See* Medicare Claims Processing Manual Chapter 4 - Part B Hospital (Including Inpatient Hospital Part B and OPPS), Section 10.2 *et. seq.* If the patient is a direct referral to observation from an outpatient department of the hospital and the observation time is eight hours or greater, CMS classifies the services under APC 8002. In 2013, the reimbursement rate for APC 8002 is $440.

98. If the patient requires an Emergency Department visit or critical care services on the day of (or day before) the observation stay and the total observation services rendered exceeds eight hours, CMS classifies the services under APC 8003. In 2013, the average reimbursement rate for APC 8003 was $798.

---

[3] CMS adjusts a hospital's APC payment to take into account non-medical factors such as the local cost of living/wage index.

99.     By falsely recording, or failing to record, "stop times," conducting post-surgery recovery in inpatient beds, classifying post-surgery recovery and discharge as observation stay time, Defendant Valley Baptist artificially increased the number of observation services that qualified for Medicare and Medicaid reimbursement.

100.    After reviewing the Observation Stay Audit, Relator realized that the excessive billing of observation stays to Medicare and Medicaid resulted from policies put in place by Defendant Valley Baptist *prior* to the audit period. Because the company's policies existed *before* the Audit, so too did the inappropriate billing of observational stays. Mac Franklin, a senior business director at Defendant Valley Baptist who had been with Valley Baptist for a number of years prior to the joint venture, also confirmed to Relator Tulin that Defendant Valley Baptist had put into place, several years before the Observation Stay Audit, the policies that resulted in the overbilling.

101.    Following the conclusion of the Observation Stay Audit, Defendants, through their hired consultants, engaged in a rebilling of those claims that were still within the normal rebilling window for Medicare and Medicaid.

102.    Claims are submitted to Medicare Administrative Contractors (MACs) by the completion of an electronic form containing the data set necessary to process the claim. Part of this data set is a "Bill Type" code entered in the form as prescribed by Medicare standard data sets. The first number in the three-digit code is for the type of provider. The second is the type of service (inpatient, outpatient, outpatient hospital, etc.). The third digit is for the bill type itself (original, amendment, replacement, etc.).

103.    By entering Bill type "147," the computer is informed that this is a hospital outpatient bill and is replacing a prior claim. Thus, the earlier claim is canceled and replaced by

the claim as delineated on the new form. The effect of this is to subtract the prior amount from the amount being paid by Medicare on the current "batch" and substituting the amount billed on the replacement bill. Medicare pays hospitals by "batching" claims and electronically transferring funds to the hospital on a periodic (*i.e.*, weekly) basis. At the same time, it sends a computer-generated spreadsheet to the hospital itemizing the bills that it has paid. Thus, the hospital or physician is able to effect a "refund" to Medicare without drawing attention to the fact that the original bills were erroneous and/or improper.

104.    The Observation Stay Audit and accompanying "rebill" only extended back to September 2011 despite the fact that Defendants had the same practices and procedures that caused the overbilling for a much longer time period than reviewed.

105.    After discovering that the improper billing of observation stays existed prior to the audit period, Defendants had actual knowledge that they (and their predecessor and partner, Valley Baptist Health System) were in receipt of government funds that were wrongly obtained. Defendants' decision to keep these funds constitutes a violation of the False Claims Act.

**VI.    COUNTS**

**COUNT ONE**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[4]**
**(Against All Defendants)**

106.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

107.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

---

[4] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(1).

28

108.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented, or caused to be presented false or fraudulent claims for improper payment medical services.

109.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

110.     By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWO**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)[5]**
**(Against All Defendants)**

111.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

112.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

113.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim. These included, without limitation, a certification on each claim submitted that Defendants were in compliance with the anti-kickback statute and Stark law. Compliance with these laws constitutes a condition of payment for Medicare and Medicaid.

114.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

---

[5] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(2).

115.     By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT THREE
### Federal False Claims Act, 31 U.S.C. § 3729 (a)(1)(G)
### (Against All Defendants)

116.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

117.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

118.     After discovering an obligation to return funds to the Government, Defendants' committed violations of 31 U.S.C. § 3729(a)(1)(G) by failing to transmit the monies to the Government, and knowingly concealing and improperly avoiding or decreasing their obligation to pay such monies to the Government.

119.     As a result of Defendants' retention of the improperly obtained funds, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT FOUR[6]
### Federal False Claims Act, 31 U.S.C. § 3729 (a)(1)(C)
### (Against All Defendants)

120.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

121.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

---

[6] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(3).

30

122.    By virtue of the kickbacks, misrepresentations, submission of false claims, and withholding funds that belonged to the Government, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), and/or (a)(1)(G).

123.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

124.    By reason of these payments and Defendants' failure to refund improper payments, the United States has been damaged, and continues to be damaged in a substantial amount.

**COUNT FIVE**
**Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.***
**(Against All Defendants)**

125.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

126.    This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

127.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

128.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Texas Medicaid Fraud Prevention Act.

129.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

130. By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## VII. PRAYER

WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

a. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the state and municipal false claims acts;

b. Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, et seq. plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount to the States and municipalities under similar provisions of their false claims acts;

c. The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State of Texas False Claims Acts;

d. The Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State of Texas False Claims Acts;

e. Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f. Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

g. The United States, the State of Texas, and the Relator recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands a trial by jury.

DATED: June 13, 2014

J. Gerard Stranch, IV (BPR #023045)
Benjamin A. Gastel (BPR #028699)
BRANSTETTER, STRANCH &
JENNINGS, PLLC
227 Second Avenue North
Nashville, Tennessee 37201-1631
Telephone: 615-254-8801
Facsimile: 615-250-3937
gerards@branstetterlaw.com

Reuben A. Guttman *
David T. Fischer *
GRANT & EISENHOFER P.A.
1747 Pennsylvania Ave. NW, Suite 875
Washington, DC 20006
Telephone: 202-386-9500
Facsimile: 202-350-5908
rguttman@gelaw.com
dfischer@gelaw.com

Jay W. Eisenhofer *
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: 646-722-8500
Facsimile: 646-722-8501
jeisenhofer@gelaw.com

Robert Sherlock *
EISENBERG GILCHRIST & CUTT
215 S. State Street
900 Parkside Tower
Salt Lake City, UT 84111
Telephone: 801-326-3633
Facsimile: 801-350-0065
rsherlock@egclegal.com

\* Not admitted in this jurisdiction, but will file *Pro Hac Vice* Motions shortly.

Attorneys for Relator Matthew Tulin

## CERTIFICATE OF SERVICE

On June **13**, 2014, I hereby certify that a copy of this Complaint was served upon the

following persons via United States Postal Service, certified mail return receipt:

/s/    *David T. Fischer*
David T. Fischer
Grant & Eisenhofer P.A.
1747 Pennsylvania Ave. NW, Suite 875
Washington, DC  20006
Tel:   (202) 386-9500
Fax:  (202) 386-9505

| United States | |
|---|---|
| United States Attorney General Eric H. Holder<br>United States Department of Justice<br>950 Pennsylvania Ave., N.W.<br>Washington, D.C.  20530 | United States Attorney General Eric H. Holder<br>c/o Ms. Joyce R. Branda<br>Deputy Director, Commercial Litigation<br>Branch - Fraud Section<br>U.S. Department of Justice<br>Ben Franklin Station<br>950 Pennsylvania Avenue<br>P.O. BOX 261<br>Washington, D.C.  20530<br>(202) 307-0231<br>(202) 616-3085 |
| United States Attorney David Rivera<br>c/o Ms. Rebecca Martin,<br>Assistant United States Attorney<br>110 9th Avenue South, Suite A-961<br>Nashville, TN 37203 | |

| Texas | |
|---|---|
| Deputy Attorney General David Mattax<br>Price Daniel Senior Building, 8th Floor<br>209 W. 14th Street<br>Austin, TX  78701 | |